# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

GREGORY F. ROBINSON,           )
                               )
          Plaintiff,           )
                               )
     v.                        )    Civ. No. 10-362-SLR
                               )
SGT. WILFRED BECKLES, CPL SGT. )
ANGELINA DEALLIE, SGT.         )
STANFORD HENRY, SGT. VERONICA )
DOWNING, C/O NICKOLAS MOHR,    )
LT. KOLAWCHE AKINBAYO, C/O     )
TRACEY HARRIS, C/O CARMELINO   )
R. SEATON, C/O RODDOCKER, and  )
C/O WAGNER,                    )
                               )
          Defendants.          )

---

David A. Felice, Esquire of Bailey & Glasser, LLP, Wilmington, Delaware. Counsel for Plaintiff.

Ophelia M. Waters, Esquire and Joseph C. Handlon, Esquire, Deputy Attorneys General. Department of Justice, Wilmington, Delaware. Counsel for Defendants.

---

## MEMORANDUM OPINION

Dated: July⧸ᵗʰ 2015
Wilmington, Delaware

ROBINSON, District Judge

## I. BACKGROUND

On April 29, 2010, plaintiff Gregory F. Robinson, an inmate incarcerated at the

James T. Vaughn Correctional Center ("JTVCC"), Smyrna, Delaware, filed this civil

rights action pursuant to 42 U.S.C. § 1983. (D.I. 2) Plaintiff's complaint names 47

defendants and consists of 209 numbered paragraphs with allegations of occurrences

from May 25, 2008 to March 15, 2010.[1] Plaintiff attached a six-inch stack of exhibits,

including grievances, disciplinary reports and letters to support the litany of allegations

detailing acts involving plaintiff and defendants. Plaintiff alleges constitutional

violations, including the First, Fourth, Fifth, Six, Eighth and Fourteenth Amendments of

the United States Constitution, as well as state tort claims. Plaintiff seeks injunctive

relief and compensatory and punitive damages. He also filed a motion for the

appointment of counsel.[2] (D.I. 5)

On August 6, 2010, the court dismissed as frivolous the majority of allegations in

the complaint.[3] *Robinson v. Danberg*, 729 F. Supp.2d 666 (D. Del. 2010). On January

---

[1]Plaintiff was a pretrial detainee during the initial allegations, convicted on October 22, 2008, and sentenced on December 10, 2008.

[2]Since filing his initial complaint and request for injunctive relief, plaintiff has filed numerous, duplicative further requests for such relief, to which the court and Warden Phelps of the JTVCC have responded. (*See, e.g.,* D.I. 7, 9, 10, 13, 15, 22, 23, 41, 44, 51, 52, 59, 71, 73, 74, 75, 76, 82, 83, 84, 85, 98, 99, 106, 107) The above record illustrates that, from the earliest stages of this litigation, prison officials have been aware of, responded to, and investigated plaintiff's allegations. Although the specific facts of the claims varied, the underlying assertions of retaliatory conduct remained constant. The court likewise responded promptly to plaintiff's injunctive motions, requiring Warden Phelps to be served with the motions and requiring responses, well before service of process was effected on defendants by plaintiff. As soon as plaintiff's mental health status was raised (plaintiff's assertion of forced administration of Haldol), the court referred the case for representation of counsel.

[3]Thirty-seven defendants were also dismissed. (D.I. 18, 19)

21, 2011, plaintiff moved to amend his complaint to correct pleading deficiencies identified by the court. (D.I. 34) On April 27, 2011, the court granted plaintiff's motion to amend.[4] (D.I. 54)

On December 16, 2010, the court dismissed the complaint for failure to submit completed service forms. (D.I. 27) Plaintiff moved for leave to file an amended complaint and two motions for the appointment of counsel. (D.I. 29, 35) The court issued an order reopening the case on February 2, 2011, and granted plaintiff thirty days to serve the complaint. (D.I. 36) On July 5, service was returned as executed. (D.I. 87-97)

A scheduling order was entered on September 7, 2011. Plaintiff served interrogatories and requests for production of records. (D.I. 114- 124) He also filed another motion for appointment of counsel, and letters regarding retaliatory conduct by correctional officers and problems with the temperature of his cell. (D.I. 110, 111, 113) A revised scheduling order was entered on March 3, 2012, extending deadlines. (D.I. 127) On April 27, 2012, plaintiff's deposition was taken. (D.I. 128)

On July 26, 2012, plaintiff filed another motion for appointment of counsel and provided a medical record in support thereof. (D.I. 148,151, 153) Plaintiff averred that he was receiving anti-psychotic medication (Haldol) against his will. (D.I. 153) On October 24, the court referred the case to the Federal Civil Panel for representation and stayed the case. (D.I. 154) The stay was lifted on December 7, 2012 upon the entry of

---

[4]The remaining defendants, correctional officers of various ranks, are: Sgt. Wilfred Beckles; Cpl. Sgt. Angelina DeAllie; Sgt. Stanford Henry; Sgt. Veronica Downing; Lt. Kolawche Akinbayo; C/O Tracey Harris; C/O Wagner; C/O Rodocker; C/O Carmelino Seaton; and C/O Nickolas Mohr.

appearance by counsel of record. (D.I. 155)

A telephonic status conference was held and a new scheduling order entered with deadlines extended further. The issue of expert discovery was stayed pending the resolution of the summary judgment motions. (D.I. 208) The parties engaged in and competed discovery. On August 18, 2014, defendants moved for summary judgment. (D.I. 189) The matter is fully briefed. (D.I. 190, 191, 192, 201, 203, 204) For the following reasons, defendants' motion will be granted.

## II. STANDARD OF REVIEW

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not

3

be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION[5]

### A. Excessive Force - Pretrial Detainee

Plaintiff alleges that during a routine cell shakedown on May 31, 2008, defendant Beckles slammed him against a wall by his throat and started to choke him. Plaintiff claims that defendant Beckles only stopped choking him when defendant Henry signaled that another inmate had witnessed the incident. There are no references in prison logbooks to this incident.

On June 20, 2008, plaintiff claims defendant Beckles intentionally closed a steel door on plaintiff's foot and ankle, causing injury. Plaintiff's left hand was also injured when defendant Beckles violently jerked his handcuffs, causing the teeth of the handcuffs to dig into plaintiff's hand and wrist. (D.I. 201 at B131)

During his April 27, 2012 deposition, plaintiff described the incident as follows:

---

[5]As noted, plaintiff's complaint consists of 209 paragraphs with allegations of random occurrences during a 22-month period. In May 2008, plaintiff was detained at JTVCC. On October 22, 2008, a jury convicted plaintiff of possession of a deadly weapon by a person prohibited. On December 10, 2008, plaintiff was sentenced to eight years of imprisonment. Between May 2008 and December 10, 2008, plaintiff's status was that of a pretrial detainee. The court's analysis begins with each discrete allegation presented by plaintiff considered against the record developed through the discovery process and applicable legal precedent.

4

I wanted to go to the shower where there was [sic] no
feces in there . . . . [Defendant Beckles] tried to make
me go in the shower where the feces was at. And I said,
just take me back to my cell. He brought me downstairs
and that's when I was telling you when I went to go in my
door, when I went to go in my cell, he tried to hit me in the
back with the door, but he caught my foot. When I backed
up to the food flap, he pulled the handcuffs real tight.
Uncuffed my right hand, and he was pulling the handcuffs
real tight to the door, When he unhandcuffed the left cuff,
he put his right hand on the handcuffs. So now he [has]
both hands on it. And he put his foot on the door and
he yanked, and he yanked the left cuff off and it split the
top of my hand.

(D.I. 201 at 131-132)

Defendant Beckles prepared a disciplinary report charging plaintiff with disorderly
or threatening behavior, creating a healthy safety and fire hazard and failing to obey an
order. (D.I. 193 at A-120) According to the disciplinary report, after being in yard and
taken inside to use the showers, plaintiff complained that the temperature of the shower
water was too hot. Defendant Beckles escorted plaintiff to a different shower area.
Plaintiff refused to enter a particular shower and demanded to go into another shower.
Defendant Beckles denied plaintiff's request and ordered him to enter the shower.
Plaintiff refused, uttering profanity and threats. Defendant Beckles warned plaintiff that
he would receive a write-up for such behavior. Plaintiff was then escorted back to his
cell. Once securely inside the cell, defendant Beckles ordered plaintiff to "come and be
uncuffed." As defendant Beckles uncuffed one hand and "was uncuffing the other hand
plaintiff tried to yank his hand away" and defendant Beckles pulled "the cuffs just as the
[door flap] opened" and "it came loose and [defendant Beckles] secured the flap." (D.I.

5

193 at A-120) While walking away from the cell, plaintiff threatened to stab defendant Beckles in the eye.

The record reflects that plaintiff requested and received medical treatment for his injuries. (D.I. 201 at B107) Medical notes indicate that plaintiff's hand was bleeding with an abrasion and edema observed. (*Id.* at B107-108) Plaintiff was given a tetanus shot, antibiotic and pain medication and x-rays were ordered. (*Id.* at B108)

An x-ray report dated July 18, 2008 indicates that there was soft tissue swelling without fracture or abnormality or dislocation of the left hand. (*Id.* at B110) An ankle x-ray report reflects no fracture or dislocation. Another x-ray taken in September 2008 shows mild osteoarthritis changes present in plaintiff's left foot. (*Id.* at B111)

As a pretrial detainee at the time of the incidents, plaintiff's allegations are considered under the Fourteenth Amendment's Due Process Clause, which prohibits the State from imposing punishment on those who have not yet been convicted of a crime, rather than the Eighth Amendment's prohibition against cruel and unusual punishment. *See Bell v. Wolfish*, 441 U.S. 520, 535–39 (1979). The United States Supreme Court recently held that courts must apply an objective standard when considering a pretrial detainee's claim of excessive force. *Kingsley v. Hendrickson*, __ U.S. __ , 2015 WL 2473447, *5 (June 22, 2015). The Court concluded that a "pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." (*Id.*) Objective reasonableness "turns on the facts and circumstances of each particular case." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Court identified several factors relevant in determining whether the force used was excessive. This nonexclusive list includes:

> [T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.* at *6.

In announcing the objective standard, the Court recognized that operating a prison is "an inordinately difficulty undertaking" and "that the safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Id.* at *7, (quoting *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. ___, ___ , 132 S. Ct. 1510, 1514 (2012)). The Court further explained that "an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a 'clearly established' right, such that 'it would [have been] clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Turning first to the incident on May 31, 2008, there is nothing in the record demonstrating that defendant Beckles in fact slammed plaintiff against a wall and chocked him.[6] Even considering the underlying facts of the May 31, 2008 claim and all reasonable inferences therefrom in the light most favorable to plaintiff, the court concludes that the use of force was not objectively unreasonable. Significantly, there is no evidence that plaintiff suffered any injury from this conduct.

---

[6]No entries in logbooks or medical records.

With respect to the June 20, 2008 incident, the record reflects that defendant Beckles ordered plaintiff to enter a shower and that plaintiff disobeyed the order, despite being warned of the consequences (a disciplinary report) for failing to comply.[7] Defendant Beckles then escorted plaintiff back to his cell. Plaintiff's foot was hit by the cell door as it was closing, resulting in minor injury. As defendant Beckles removed the handcuffs, plaintiff suffered injuries to his hand. Although defendant Beckles and plaintiff's accounts vary on some details, the resulting injuries demonstrate that both the force used to remove (defendant Beckles) and the force used to resist (plaintiff) resulted in minimal injury to plaintiff. In fact, the medical records depict plaintiff's hand as being treated with medication and x-rays revealed no fracture or abnormality. No further follow-up regarding the hand injury is noted. With respect to plaintiff's foot, an x-ray taken in September 2008 indicates osteoarthritis, apparently unrelated to the steel door incident.

## B. Conditions of Confinement - Pretrial Detainee

On June 15, 2008, plaintiff alleges that the toilet in his cell overflowed and that defendants Akinbayo and Rodocker left him in his cell for over seven hours with standing toilet water. During his deposition, plaintiff testified that he did not intentionally flood his toilet. (D.I. 201at B130)

The disciplinary report filed in connection with this incident reflects that defendants Akinbayo and Rodocker were serving chow on plaintiff's housing tier when

---

[7]There is nothing in the record substantiating that there was feces in the shower which defendant Beckles ordered plaintiff to enter.

plaintiff stated he was holding his tray or flooding his toilet. (D.I. 193 at A-119)

Defendant Akinbayo described what next transpired:

> Plaintiff made personal threat[s] by stating 'I will see you
> on the street. I got something for you. I don't stab Niggas
> I shoot Niggas.' Plaintiff was upset from the previous night
> during his phone call. Plaintiff wanted to make a second
> phone call and he was told his time was up on the phone.
> Plaintiff was informed that the phone calls are 15 minutes
> each and someone else needs to use the phone.
> Plaintiff threatened to break the phone and was observed
> by [the] pod officer hitting the phone on the wall. The phone
> was checked . . . for any damage incurred. Plaintiff flooded
> his toilet when the food trays were being collected on D Tier.
> Plaintiff's behavior, demeanor, threat[s] and constant use of
> profanity which has been ongoing since he go to the SHU
> from Pre-trial will not be tolerated in a correctional setting.

(Id.)

Plaintiff next asserts on August 8, 2008, he was placed in a new, single

occupancy cell with another inmate's blood in the cell, and was forced by defendant

Beckles to clean the cell with no gloves. The "next shift provided plaintiff with towels,

water, a bucket and a mop." (D.I. 201 at B008) The blood was in the cell for several

days after another inmate had "busted his head open." (D.I. 201 at B008)

At his deposition, defendant Beckles denied placing plaintiff in a cell where there

was blood and to forcing plaintiff to clean up blood with or without gloves. (D.I. 193 at

A-168) The record does not reflect any incident reports filed with respect to plaintiff's

allegations.

Plaintiff contends that on November 18, 2008, defendant Henry refused to

provide necessary and appropriate supplies to clean up urine that a "tier-man" had

sprayed under plaintiff's cell door. At his deposition, plaintiff testified that he is certain

9

that defendant Henry allowed the tier-man to spray the urine because defendant Henry joked about the smell of urine immediately after it was sprayed. (D.I. 201 at B135)

Defendant Henry denied this claim at his deposition. (D.I. 203, ex. B) He testified that if it were true that any person sprayed urine, then a report would have been written. There were no reports.

In support of the allegations, plaintiff retained Michael J. McCreanor ("McCreanor")[8] as an expert to review paperwork, regulations, depositions, interviews and the investigative reports filed by Internal Affairs ("IA") investigator Boney. According to McCreanor,

> when an inmate reports that there is blood and/or urine in his cell, the inmate is to be given the necessary equipment and materials to clean the area. If the blood or urine is said to be or suspected to be from another inmate, a supervisor should be notified and an incident report should be completed.

(D.I. 201 at B03) McCreanor did not find any reports filed regarding the June 15, August 8, or November 18, 2008 incidents.

Constitutional challenges to the conditions of pretrial confinement are analyzed under the Fourteenth Amendment's Due Process Clause. *See Hubbard v. Taylor*, 399 F.3d 150, 158 n. 13 (3d Cir.2005). In *Bell v. Wolfish*, the Supreme Court held that, because a pretrial detainee has not been found guilty of any crime, he may only be detained "to ensure his presence at trial and may [be] subject[ed] to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not

---

[8]McCreanor worked for the Delaware Department of Correction for 22 years, 18 of which "were spent as a supervisor providing annual refresher training in the use of force and chemical agents." (D.I. 201 at B1-3)

amount to punishment." 441 U.S. at 536-37. If a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, such as ensuring security and order at the institution, it does not, without more, amount to punishment. *Id.* at 539.

Applying this standard to the record at bar,[9] and taking all inferences in the light most favorable to plaintiff, the court concludes that the conditions do not rise to the level of punishment in violation of the Due Process Clause. Plaintiff's complaint is limited to an alleged exposure to unsanitary material on three isolated occasions with no resulting injuries. Although plaintiff avers that the exposure to the toilet water on June 15th was "over seven hours," he has not adduced facts explaining the nature of the exposure or what harm he suffered. With respect to the August 8th allegation, plaintiff states that the blood came from another inmate who busted his head open in the cell several days before defendant Beckles allegedly ordered plaintiff to clean it up. Plaintiff has not, however, specified how long he was exposed to the dried blood, provided any evidence concerning the time it took him to clean up the blood, or alleged any injury.[10] Similarly, regarding the November 18th urine spraying, there is no evidence on the duration or nature of this alleged exposure or how plaintiff was injured.

The circumstances where courts have found Fourteenth Amendment violations based on prison conditions have involved deprivations significantly more severe than the three claims at issue here. *See Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) (pretrial detainee who had to endure the stench of his own feces and urine for four days because of an overflowed toilet in his cell had not suffered a constitutional

---

[9]I.e., assuming the incident occurred at all.

[10] Such information might suggest how much blood was in the cell.

11

violation); *Hubbard v. Taylor*, 538 F.3d 229, 235 (3d Cir. 2008) (holding that triple celling of pretrial detainees and use of floor mattresses did not violate the Due Process clause because the inmates were not subjected to genuine privations and hardships over an extended period of time); *Shepherd v. Dallas County*, 591 F.3d 445 (5th Cir. 2009) (the routine failure to give some inmates their prescription medications and failure to diagnose, monitor or treat chronic illnesses was not a constitutional violation); *Piskanin v. Hammer*, 269 Fed. Appx. 159, 162-63 (3d Cir. 2008) (placement of pretrial detainee on suicide watch for a brief period of time, and the removal of his religious did not amount to punishment prior to an adjudication of guilt). The Constitution "does not mandate comfortable prisons." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981); *Tesch v. County of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) ("it is not unreasonable for a pretrial detainee to expect to experience a short-term imposition on a basic human necessity").

The court finds McCreanor's report is persuasive to the extent that, if the allegations were true, defendants Akinbayo, Rodocker, Beckles and Henry did not follow applicable prison rules when they: (1) did not give plaintiff the necessary equipment and materials to clean the areas; and (2) did not notify a supervisor or file a report. The mere failure of prison officials to follow their own regulations alone, however, is not a constitutional violation. *See Crist v. Phelps*, 810 F. Supp.2d 703, 708 n. 4 (D. Del. 2011) (citations omitted). Prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that are needed to preserve internal order and to maintain institutional security. *Beard v. Banks*, 548 U.S. 521 (2006)

## C. Due Process - Pretrial Detainee

In his complaint, plaintiff claims that defendants Beckles and DeAllie set him up by filing false charges related to a missing razor blade and threatened to make his life miserable during a disciplinary hearing.

A disciplinary report filed on August 30, 2008 reflects that plaintiff was given a razor[11] and did not return the razor intact with the blade to correctional officers. (D.I. 193 at A-160) When defendant DeAllie asked plaintiff for the blade, plaintiff cursed her and walked away.[12] Plaintiff's cell was then searched in order to recover the blade. Plaintiff was also stripped searched, handcuffed and removed from the cell. During the search, plaintiff was combative and denied keeping the blade. The search uncovered contraband, including two altered towels and an altered sweatshirt. The razor blade was not found in plaintiff's cell.

Plaintiff was charged and found guilty following a disciplinary hearing with: (1) damage or violation of property; (2) disorderly or threatening behavior; (3) abuse of privileges; (4) creating a health, safety or fire hazard; (5) disrespect; (6) failure to obey an order; and (7) possession of non-dangerous contraband. (D.I. 193 at A128)

Defendant Beckles testified that correctional officers distribute razors to inmates in their housing units during the morning hours. (*Id.* at A-167) The razors are collected later with the food trays in order to allow inmates sufficient time to shave. Because a razor blade has the potential to be used as a weapon, correctional officers are careful to make sure that razors are returned intact. If an inmate does not return, or keeps part

[11] According to defendant DeAllie, inmates are given an intact disposable razor consisting of two parts, the casing and the blade. (D.I. 193 at A-159)

[12] Plaintiff continued to threaten DeAllie and her family, specifically threatening to rape her daughter. Plaintiff was issued a write-up for this behavior. (D.I. 193 at A-130)

13

of the razor, an incident report would be prepared and the inmate's cell would be searched or "shaken down." (Id.)

Plaintiff testified that, due to skin irritations, he does not use razors and defendants Beckles and DeAllie made up the charges to retaliate against him. (D.I. 201 at B133) He notes there are no corresponding entries in the logbook regarding the incident, the search of his cell did not yield the missing blade, and the casing was not maintained as evidence for the disciplinary hearing.

As a pretrial detainee, plaintiff's liberty interests were firmly grounded in federal constitutional law. Fuentes v. Wagner, 206 F.3d 335, 341 (3d Cir. 2000). In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate the protection against deprivation of liberty without due process of law, the proper inquiry is whether those conditions amount to punishment of the detainee. Id. (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)). A pretrial detainee's rights are at least equivalent to the rights afforded prisoners, including the due process protections for disciplinary hearings. Id. at 545.

Upon sentencing, a sentenced prisoner looks to state law for the protection of his personal liberties. Fuentes v. Wagner, 206 F.3d at 341 (citing Cobb v. Aytch, 643 F.2d 946, 957 (3d Cir.1981)). Prisoners must be accorded due process before prison authorities may deprive them of state created liberty interests. Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

A prison disciplinary hearing satisfies the Due Process Clause if the inmate is provided with: (1) written notice of the charges and not less than 24 hours to marshal the facts and prepare a defense for an appearance at the disciplinary hearing; (2) a

14

written statement by the fact finder as to the evidence relied on and the reasons for the disciplinary action; and (3) an opportunity "to call witnesses and present documentary evidence in his defense when to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 563–71; *Griffin v. Spratt*, 969 F.2d 16, 19–20 (3d Cir.1992). It is axiomatic, however, that to be entitled to procedural due process protections as set forth in *Wolff*, a prisoner must be deprived of a liberty interest. *See Wolff*, 418 U.S. at 557–558.

The Due Process Clause itself confers no liberty interest in freedom from state action taken "within the sentence imposed."[13] *Sandin v. Conner*, 515 U.S. 472, 480 (1995) (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983)). Moreover, state created liberty interests protected by the Due Process Clause are generally limited to restraints on prisoners that impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir.1997) (quoting *Sandin*, 515 U.S. at 484). In deciding whether a protected liberty interest exists under *Sandin*, a federal court must consider the duration of the disciplinary confinement and the conditions of that confinement in relation to other prison conditions. *Mitchell v. Horn*, 318 F.3d 523, 532 (3d Cir. 2003) (citing *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000)); *see Young v. Beard*, 227 Fed.Appx. 138 (3d Cir. 2007) (an inmate sentenced to an aggregate of 930 days in disciplinary confinement without day room or telephone privileges did not constitute an atypical and significant hardship sufficient to trigger a liberty interest under *Sandin*).

_____

[13]*Sandin* applies only to convicted inmates, not to pretrial detainees. *Stevenson v. Carroll*, 495 F.3d 62, 69 n.4 (3d Cir. 2007).

15

Considering this authority against the summary judgment record at bar, the court finds that there is no evidence from which a reasonable jury could find a violation of plaintiff's due process rights. Significantly, defendant Beckles testified that inmates can use razor blades as weapons and immediate action must be taken to locate and retrieve them. Although plaintiff denied using razors because of skin sensitivity, he has not adduced evidence showing that he did not receive a razor from defendant DeAllie on August 30, 2008. Accordingly, when defendant DeAllie returned to plaintiff's cell for the razor and discovered the missing blade, the court finds the ensuring search of the cell and of plaintiff was not arbitrary, punitive or excessive. *Bell*, at 540 n. 23 (in determining whether conditions or restrictions are reasonably related to government's interest in maintaining security and order, courts should defer to the expertise of correctional officials).

Moreover, there is no due process violation with respect to the subsequent disciplinary proceedings. Plaintiff received written notice of the charges and was afforded a hearing, found guilty of all violations, and sanctioned according to prison rules and regulations. (D.I. 193 at A-68) Plaintiff has not produced any evidence to suggest that the restrictions were not reasonably related to the legitimate non-punitive government interest in managing a detention facility and maintaining security and order.

### D. Due Process - Post Sentence

Plaintiff also claims his due process rights were violated on two days in September 2009 when defendant Downing allegedly filed false reports to cover up the fact that she hit him in the mouth and caused injury. In his deposition, plaintiff testified that while he was handcuffed and walking out of this cell, defendant Downing hit him in

16

the mouth and bloodied his lip and mouth. (D.I. 201 at B133) Plaintiff was uncertain whether defendant Downing hit him with a closed or open fist. (*Id.* at B133-134) He was taken to the infirmary and given pain medication, however, the nurse refused to document his injuries. (*Id.* at B134)

In her deposition, defendant Downing denied slapping plaintiff and was unaware of the accusation of writing false reports about him. (D.I. 203, ex. A)

The court finds that the disparate versions of this incident do not create a genuine issue from which a reasonable jury could return a verdict in plaintiff's favor. Simply, plaintiff cannot oppose summary judgment by resting upon the mere allegations presented in his pleadings. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

### E. Excessive Force - Post Sentence

Plaintiff avers that on July 10, 2009, defendant DeAllie sprayed capstun (mace) while plaintiff was secured behind a locked maximum security cell door, posing no threat. According to plaintiff, following a routine cell shakedown, he was permitted to make a phone call to his father. (D.I. 201 at B009) Correctional officers terminated the phone call shortly after it began. Another inmate ("GL") stuck up for plaintiff and was "maced and taken away to [the] hole." (*Id.*) Plaintiff alleges that defendant DeAllie then returned and sprayed mace into his cell, and laughed as she walked away. The mace caused plaintiff to cough and feel very uncomfortable. (*Id.* at B009) Plaintiff said that requests for medical treatment were denied. (*Id.* at B083) Plaintiff filed grievances about the terminated phone all, denial of medical care, and defendant DeAllie's macing of his cell. (*Id.* at B080, 083) Plaintiff also complained that mace caused stain marks on his new sneakers. (*Id.* at B082)

17

Plaintiff submitted affidavits of two inmates ("KJ" and "EE") to support his version

of events. (D.I. 201 at B014, B015) According to KJ:[14]

> I stood in my cell door and watched defendant DeAllie
> mace plaintiff [who] was locked in his cell door. Plaintiff
> was denied to see a nurse or a doctor. At one point,
> plaintiff couldn't breathe and was still wasn't allowed to
> see a doctor or nurse.

(D.I. 201 at B014)

A declaration submitted by EE[15] reflects that he and plaintiff were housed in

separate cells, next to each other. (D.I. 201 at B015) According to EE, "[a]round 2010,

I heard plaintiff tell defendant DeAllie there was a screw in his food." Next, EE heard

defendant DeAllie mace plaintiff through the [cell door] flap and "put cuffs on his after

entering his cell. They brought [plaintiff] out of his cell and began pushing him, after he

was handcuffed behind his back into the interview room." (Id.)

McCreanor testified that there is a reference in the logbook to GL being

capstunned due to his attempt to assault prison staff. (D.I. 193 at A-176) At that time,

GL was housed in a cell near plaintiff. (Id. at A-176-77) After GL was capstunned, the

ventilation was turned off in the prison to "keep the fumes" from "spreading throughout

the tier." (Id. at A-176) McCreanor stated that the logbook does not reference any

other inmate besides GL being capstunned on June 10, 2009. (Id.)

Incident reports prepared by correctional officers Hall and Givens indicate that

they conducted the routine shakedown of plaintiff's cell on July 10, 2009 at

approximately 2000 hours. (D.I. 201 at B076, B078) They discovered an altered

---

[14]KL's affidavit is undated and not notarized. (D.I. 201 at B014)

[15]This declaration is dated November 6, 2013. (D.I. 201 at B015)

18

sweatshirt and pair of altered shorts, non-dangerous contraband. As a result, plaintiff was cited for a housing violation.

Defendant DeAllie completed an incident report reflecting that the shakedown occurred at 0715 hours. (*Id.* at B074) According to the incident report, while assisting with routine shakedowns on the tier, plaintiff - cuffed and standing outside his cell - became "extremely irate and started yelling obscenities and threats" to defendant DeAllie and correctional officers Hall and Givens. (D.I. 201 at B074) Among the vulgarities and threats uttered, plaintiff vowed to kill them and their children. (*Id.*) Defendant DeAllie wrote plaintiff up for disorderly or threatening behavior and disrespect.

A letter authored by Internal Affairs ("IA") officer Boney to Warden Phelps reflects that on July 15, 2009, Boney interviewed plaintiff about the allegations of foreign objects in his food. (D.I. 201 at B064-067) During their discussion, plaintiff told Boney that on July 10, 2009, defendant DeAllie walked by plaintiff's cell and sprayed mace under his cell door for "no reason." (*Id.* at B065) Plaintiff said that the mace struck his left sneaker and left a mark. Boney examined the sneaker and noted "a slight discoloration to the side of the sneaker." (*Id.*) Although plaintiff showed him the unwashed pants he was wearing at the time of the alleged incident, Boney observed "no evidence of mace or any discoloration to his pants or other parts of his sneaker." (*Id.*) According to Boney, plaintiff did not complain about irritation from the mace.

When considering an excessive use of force claim, a district court must consider whether force was applied in a "good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6–7

19

(1992). Courts look to several factors when making this determination, including: (1)
the need for the application of force; (2) the relationship between the need and the
amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the
threat to the safety of staff and inmates, as reasonably perceived by prison officials;
and (5) any efforts made to temper the severity of a forceful response. *Id.*; *Brooks v.
Kyler*, 204 F.3d 102, 106 (3d Cir. 2000). Accordingly, the use of mace is not a per se
violation of the Eighth Amendment. *Passmore v. Ianello*, 528 Fed.Appx. 144, 147 (3d
Cir. 2013); *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) (finding that the use of
mace, tear gas or other chemical agent of the like nature, when reasonably necessary
to subdue recalcitrant prisoners, does not constitute cruel and inhuman punishment).

The undisputed record reflects that on July 10, 2009, there was a shakedown of
plaintiff's cell, GL was maced in a nearby area and transferred into a punitive housing
area. There is little agreement, however, of the events that next transpired. Although
plaintiff avers that defendant DeAllie sprayed mace into his cell, there are no incident
reports or logbook entries evidencing this incident. While the affidavits of KL and EE
state that defendant DeAllie maced plaintiff, there are flaws and inconsistencies in their
accounts. Specifically, KJ's affidavit is not notarized or dated, and does not state the
date of the alleged macing. EE's declaration is imprecise, setting the date of macing as
"[a]round 2010." (*Id.* at B015) Further, EE states that, after defendant DeAllie sprayed
the mace through the cell door flap, plaintiff was taken out of the cell and to an interview
room. However, according to KJ's account, plaintiff was left inside his cell after the
macing and was not removed from the cell and taken to an interview room.

Although Boney noticed a slight discoloration on plaintiff's sneaker, he did not

20

observe evidence of mace on the pants plaintiff was wearing on July 10, 2009. The significance of a stain on plaintiff's sneakers is negligible because, without forensic testing, the composition of any stain is unknown. Moreover, even if testing of the stain had occurred and proven positive for mace, this does not prove that defendant DeAllie sprayed the mace that caused the stain.

With respect to disparities among the incident reports, plaintiff suggests that correctional officers Hall and Givens did not mention plaintiff's behavior (including threats and vulgarities) because this never occurred. While plaintiff posits that defendant DeAllie invented a story that he was disrespectful and threatening in order to cover up her own conduct, the court finds nothing in this record to lend credence to this supposition.

Even assuming that defendant DeAllie did spray capstun under plaintiff's cell or through the flap,[16] the court finds that the use of force was objectively de minimus. *Hudson v. McMillian*, 503 U.S. at 9-10 (The Eighth Amendment does not protect an inmate against objectively de minimus use of force); *Whitely v. Albers,* 475 U.S. 312, 319 (1986) ("The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition de minimus uses of physical force, provided the use of force is not of a sort repugnant to the conscience of mankind.").

## F. Conditions of Confinement - Post Sentence

### 1. Foreign objects in food

---

[16]Recall that mace was used in a nearby area, not removed through the ventilation system.

21

Plaintiff alleges that on December 2, 2009, he bit down on a foreign object in his

food that defendants Henry and Harris claimed to have placed in his food. Plaintiff

testified that,

> [w]hen defendants Henry and Harris came to collect my tray,
> they asked, defendant Henry asked me, he said, 'Your
> stomach hurt?' And defendant Harris said, 'It should.'
> And then she closed the flap. But I had the two pieces
> of metal I had in my food . . . I put [two pieces of metal]
> in a bag and sent it to Internal Affairs.

(D.I. 201 at B137) As a result of biting into the objects, plaintiff suffered damage to his

teeth.

Plaintiff's expert McCreanor testified that foods prepared for inmates sometimes

comes in large cans or plastic bags held closed with metal bands. (D.I. 193 at A-173)

In the prison setting, food preparation occurs quickly as approximately 2400 inmates

have to be fed in a very short period of time. (Id.) Sometimes metal shards fall into the

food. If an inmate finds a foreign object in his food, he is supposed to notify a

correctional officer who, in turn, should notify a supervisor and complete an incident

report. (Id. at A-174)

After considering the letters sent from plaintiff to Boney, which contained three

foreign objects, McCreanor concluded:

> [The first item was] a piece of metal which . . . [appeared] to be
> a pre-packaged food item, the [second object was] a piece
> of glass or hard clear plastic of an undetermined origin
> and [the third was] a hard object wrapped in a non-see-through
> substance, enclosed in a tied piece of plastic that could not
> be examined. It felt as if it was a piece of metal band, but
> until it is inspected this remains a speculation.

(D.I. 201 at B02; D.I. 193 at A-174-75)

22

Plaintiff's medical and dental complaints were evaluated. An x-ray revealed no evidence of a metallic foreign body in his chest or abdomen. (D.I. 193 at A-177) Dental examination records indicate excessive tooth decay, with some teeth requiring extraction, but no evidence of chipped teeth.

The Eighth Amendment requires prison officials to provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)). A prisoner asserting a conditions of confinement claim must show that the alleged deprivation is "sufficiently serious" and that he has been deprived of the "minimal civilized measure of life's necessities." *Id.* at 834 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Accordingly, the Eighth Amendment requires that prison officials provide nutritionally adequate food that is prepared and served under conditions that do not present an immediate danger to the health and well-being of the inmates who consume it. *Gregory v. Danberg*, Civil No. 08–539–GMS, 2011 WL 4480445, *5–6 (D. Del. Sep. 23, 2011). *See also Duran v. Merline*, 923 F. Supp.2d 702, 720 (D. N.J. 2013).

The United States Court of Appeals for the Third Circuit has recognized that "only a substantial deprivation of food to a prisoner sets forth a viable Eighth Amendment claim." *Lindsey v. O'Connor*, 327 Fed. Appx. 319, 321 (3d Cir. 2009); *Shepler v. Jefferson Cnty. Jail Bd. Member*, Civil No. 13–0521, 2014 WL 122987, *2 n. 5 (W.D. Pa. Jan. 13, 2014); *Gardner v. Lanigan*, Civil No. 13–7064, 2013 WL 6669230, at *3 n. 4 (D. N.J. Dec. 18, 2013) (citations omitted); *Duran*, 923 F. Supp.2d at 721

23

(citations omitted). In addition, a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official is deliberately indifferent, that is, the official knows of and disregards a substantial risk of serious harm to inmate health or safety. *Farmer,* 511 U.S. at 837, 847. The official must both be aware of facts from which he could infer that a substantial risk of serious harm exists, and he must draw that inference. *Id.* (holding that both subjective and objective components must be satisfied). *See also Watson v. Secretary Pennsylvania Dept. of Corrections*, 567 Fed. Appx. 75, 78 (3d Cir. 2014).

Evaluating this authority against the record at bar, the court concludes that a reasonable jury could not conclude that the objects found in plaintiff's food amount to a constitutional violation. Notably, plaintiff's own expert opined, that due to the institutional demands of a correctional facility, food preparation occurs within a short period for thousands of inmates. As a result, the fact that pieces of metal or foreign objects find their way into meals may occur by happenstance.

Even assuming that the metal or foreign objects were placed in plaintiff's food by defendants, this conduct may be shameful and vindictive, but the record does not evince that plaintiff endured a substantial deprivation, or anything more than temporary distress. Plaintiff has not alleged that he has suffered any effects of a prolonged and nutritionally inadequate diet, such as malnutrition, weakness, fatigue, or illness. Plaintiff's allegations of temporary distress do not establish an Eighth Amendment violation. *See Nickles v. Taylor*, 2010 WL 1949447, at *5 (D. N.J. May 14, 2010) (holding that no Eighth Amendment violation was established where plaintiff offered no facts to show that he endured such a substantial deprivation). *See also Brown v.*

24

*Sobina*, Civil No. 08-128E, 2009 WL 5173717, at *6-7 (W.D. Pa. Dec. 29, 2009)

(holding that plaintiff did not show Eighth Amendment violation regarding spoiled food,

where there was no evidence that he suffered more than temporary discomfort);

*Passmore v. Ianello*, 528 Fed. Appx. 144 at 148 (observing that a prisoner does not

have a constitutional right to choose when to shower).

### 2. Sleep deprivation

Plaintiff contends that beginning in late 2009 through early 2010, defendants

Henry, Mohr and Wagner deprived him of sleep by banging and kicking his cell door,

shining lights into his cell, and waking him for no reason. In his deposition, plaintiff

explained this allegation:

> A: Depriving me of my sleep with defendant Henry.
> Q: What do you mean?
> A: Kicking and banging on my door to deprive me
> of my sleep.
> Q: You say deprive you of your sleep. What do you mean?
> A: Waking me out of my sleep for no apparent reason.
> Q: Now, let me ask you this? Do inmates have to get
> up a certain time of the day?
> A: No.
> Q: Do they have to go to bed a certain time of the day?
> A: No.
> Q: So you can go to sleep when you want?
> A: Yeah.
> Q: You can wake up when you want?
> A: Yeah.
> Q: If an officer has to get in touch with you, how do they get
> in touch with you?
> A: They wake you up.
> Q: What do they do?
> A: Tap on your door or call your name, but not at liberty
> pounding and kicking on your door day in - - every day they
> come into work.

(D.I.201 at B139)

According to the affidavits of inmates "LP" and "DI," on unspecific dates, they have witnessed correctional officers harassing plaintiff. (D.I. 201 at B011, B012-013) Plaintiff notes the existence of an IA report in which an unidentified inmate states that some correctional officers would kick plaintiff's cell door. Plaintiff is unable to investigate the unidentified inmate's statement further because defendants refuse to disclose his identity based on the fact that disclosure of inmates' names who assist Internal Affairs is highly confidential.

At his deposition, defendant Beckles denied ever waking plaintiff out of his sleep. (D.I. 193 at A-168a) Defendant Beckles testified that the reasons an inmate might be awakened include: official head counts; court proceedings; and appointments. While conducting head counts, if an inmate is under the covers and is not clearly visible, correctional officers will tap on the cell to look for movement. During area counts,[17] correctional officers use flashlights to shine into a cell to make sure that the inmate is present and then move on to the next cell. (Id.)

The court finds that plaintiff has not presented evidence to demonstrate that he was awakened for any reason other than head counts, area counts, court proceedings, or appointments. This alleged deprivation is not sufficiently serious to implicate the Eighth Amendment. Moreover, federal courts are not overseers of the day-to-day management of prisons. Prison officials require broad discretionary authority as the "operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). Consequently, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies

---

[17] Area checks are done to ensure that an inmate is in his cell during lights out. (D.I. 193 at A-168a)

and practices that are needed to preserve internal order and to maintain institutional

security. *Beard v. Banks*, 548 U.S. 521 (2006); *Bell v. Wolfish*, 441 U.S. 520, 527

(1979).

## G. Snitch Claims

Plaintiff alleges that defendants Beckles, Downing, Henry and Mohr have called

him a snitch on various dates in 2008 and 2010. (D.I. 201 at B140) At his deposition,

plaintiff averred:

> A: It has been occurring since '08.
> Q: So it's been occurring since '08. You don't know when?
> A: No.
> Q: You don't know where you were housed?
> A: Everywhere I go.
> Q: Everywhere you go? What has been the result of this
> claim that you're a snitch, what has happened to you, if anything?
> A: Say again?
> Q: What has happened to you as a result of this?
> A: Turned a lot of inmates against me.
> Q: What do you mean?
> A: Turned a lot of inmates against me that want to do
> something to me.
> Q: Give me an example. Have you had an altercation
> with an inmate?
> A: They always sending death threats and stuff like that.
> Q: You said 'they.'
>
> A: Yeah, multiple inmates now.
>     *       *       *
> Q: So what do they say, who are these inmates?
> A: I don't know their names?
> Q: Where are you housed when this is occurring?
> A: Anywhere I move at.
> Q: So everywhere you move -
> A: They turned over 200 some inmates against me.

(D.I. 201 at B140) Plaintiff denied being in a fight with another inmate while

incarcerated. (D.I. 193 at A-115) He has never been in fights with anyone outside of

27

prison. Plaintiff denied that there was any reason to call him a snitch. (*Id.* at A-112-113) The affidavit of inmate "LP," states that, since July 20 of an unspecified year, plaintiff has been "subject to harassment, threats, degrading remarks . . . [and] labeled a snitch by staff." (D.I. 201 at B012)

Plaintiff's expert McCreanor opined that correctional officers' act of calling an inmate a snitch places the inmate at risk of serious bodily injury. (D.I. 201 at B002) McCreanor found documentation where plaintiff alleges that defendants called him a snitch and "[i]f this is true, would place plaintiff in danger of being beaten, stabbed or killed." (*Id.*)

Defendant Beckles testified that a "snitch" is "someone who gives information to other people about someone else." (D.I. 193 at A-168) It would be dangerous for an inmate to be labeled a snitch because other inmates might attack him. (*Id.*) Defendant Beckles denied ever calling plaintiff a snitch.

IA officer Boney investigated the snitch allegations. (D.I. 191 at A-50 - 52) Boney reviewed reports, interviewed plaintiff, inmates and correctional officers identified by plaintiff as labeling him a snitch. Boney found no evidence to support plaintiff's claims. He determined that the reason inmates looked at plaintiff differently was because of the unwarranted and excessive attention directed at him and the housing unit, rather than the snitch label. Boney averred:

> Plaintiff has stated many times that his only remedy is to be transferred to another institution. It appears this was to be accomplished by a constant barrage of grievances alleging threatening and abusive behavior by staff. Plaintiff has numerous write-ups for using profanity and acting disorderly towards staff but at the same time attempts to create an image of innocent victim, denying

28

> ever causing any problems. The evidence suggests that
> plaintiff believes the louder he complains the more likely
> his transfer out of the JTVCC will become a reality;
> however, this is not the case.

(D.I. 191 at A-51-52)

"This court has recognized the serious implications of being labeled a 'snitch' in prison." *Shockley v. McCarty,* 677 F. Supp.2d 741, 746 (D. Del. 2009) (citing *Blizzard v. Hastings,* 886 F. Supp. 405, 410 (D. Del 1995)). In *Blizzard,* the court found that the snitch label could place an inmate at risk of being harmed. Moreover, the court held that a prisoner's allegations that prison officials labeled him a snitch could constitute an Eighth Amendment claim if the prisoner could demonstrate that "prison officials have, with 'deliberate indifference,' exposed him to an unreasonable risk of harm." *Id.* (citing *Farmer v. Brennan,* 511 U.S. at 847 (1994); *Hellig v. McKinney,* 509 U.S. 25, 35-36 (1993)). "We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope v. Pelzer,* 536 U.S. 730, 738 (2002) (citing *Farmer,* 511 U.S. at 842). "The Eighth Amendment imposes a 'duty upon prison officials to take reasonable measures to protect prisoners from violence at the hands of other prisoners.'" *Evans v. Cameron,* 442 Fed.Appx. 704, 706 (3d Cir. 2011) (quoting *Hamilton v. Leavy,* 117 F.3d 742, 746 (3d Cir. 1997)).

As reflected in the summary of plaintiff's efforts to obtain a temporary restraining order, practically from initiating this action, plaintiff has alleged that correctional officers labeled him a snitch. Appreciating the danger such a label might present to plaintiff, the court ordered Warden Phelps to respond to the charges four separate times.

In response, Warden Phelps directed Boney to launch an investigation into the

29

claims. In addition to reviewing plaintiff's grievance history, disciplinary and investigative reports, Boney interviewed plaintiff, correctional officers and other inmates. Boney found no evidence to support plaintiff's assertions, but instead concluded plaintiff's claims were made to force a transfer to another prison.

The court recognizes the significant dangers accompanying the label of snitch. To withstand summary judgment, however, plaintiff must "make a showing sufficient to establish the existence of [every] element essential to [his] case," and on which he bears the burden of proof at trial. Cooper v. Sniezek, 418 Fed. Appx. 56, 58 (3d Cir. 2011). Although plaintiff raised the snitch allegation at the earliest stages of this litigation, repeated investigations and opportunities for plaintiff to present such evidence have yielded nothing to substantiate the claims. Significantly, plaintiff has failed to demonstrate that defendants have, with "deliberate indifference, exposed him to an unreasonable risk of harm." Farmer v. Brennan, 511 U.S. at 847.

## H. Retaliation

In his complaint, plaintiff claimed correctional officers filed false charges in retaliation for the exercise of seeking redress through grievance or legal proceeding. In plaintiff's opposition to summary judgment, he has withdrawn from consideration the specific allegations contained in his complaint. (D.I. 201) Plaintiff alleges, instead, that "all the challenged conduct was undertaken in retaliation for his decision to exercise his Constitutional right to seek redress by way of grievance or legal proceedings." (Id. at 4)

By withdrawing this claim, defendants contend it is unclear what remains of plaintiff's retaliation claim. The court agrees. It appears plaintiff seeks to cast all defendants' alleged conduct as retaliatory without providing any details, evidence or

30

analysis. At this stage in the proceedings, conclusory contentions devoid of specific facts cannot survive defendants' motion for summary judgment.

## IV. CONCLUSION

For the reasons stated, defendants' motion for summary judgment is granted.[18] An appropriate order shall issue.

---

[18]Accordingly, the issue of expert discovery is moot, and the court declines to exercise supplemental jurisdiction of the state law claims.